UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROLANDO PIMENTEL, et al., | Case No. 18-cv-00411-EMC |
| Plaintiffs, | **RELATED TO** |
| v. | Case No. 18-cv-01958-EMC |
| ROME ALOISE, et al., | |
| Defendants. | |

| | |
|---|---|
| ROLANDO PIMENTEL, et al., | **ORDER (1) GRANTING ALOISE DEFENDANTS' MOTION TO DISMISS; (2) GRANTING PLAINTIFFS' MOTION FOR LEAVE TO AMEND; (3) GRANTING IN PART AND DENYING IN PART ALOISE DEFENDANTS' MOTION TO DISMISS AMENDED CLAIMS; AND (4) GRANTING BONSALL DEFENDANTS' MOTION TO DISMISS** |
| Plaintiffs, | |
| v. | |
| ROBERT BONSALL, et al., | |
| Defendants. | |

Docket Nos. 31, 38, 44 in C-18-0411 EMC
Docket No. 16 in C-18-1958 EMC

Plaintiffs are two individuals, Rolando Pimentel and Zacharias Salas, who, during the relevant period of events, were members of a local union, the Teamsters Local Union No. 601 ("Local 601"). They have filed two actions that have been related before this Court. Both actions relate to the 2013 election for officers for Local 601. Plaintiffs were part of a slate of candidates (the Pimentel Slate) that challenged the incumbent principal officer's slate (the Alvarado Slate). Plaintiffs lost.

In the first lawsuit, No. C-18-0411 EMC, Plaintiffs sue the incumbent principal officer, Ashley Alvarado, and Local 601. They also sue Teamsters Joint Council No. 7 ("Joint Council") – a governing body above Local 601 but below the overarching organization, the International

Brotherhood of Teamsters ("IBT") – and the Joint Council's President, Rome Aloise. In this action, Plaintiffs claim, for the most part, election-related misconduct on the part of Mr. Aloise (who endorsed Ms. Alvarado's candidacy) and Ms. Alvarado. Hereinafter, the defendants in the first lawsuit shall be referred to collectively as the Aloise Defendants.

In the second lawsuit, No. C-18-1958 EMC, Plaintiffs sue the law firm Beeson, Tayer, Bodine LLP and one of its shareholders, Robert Bonsall. The Beeson firm and Mr. Bonsall provide legal services to Local 601 and the Joint Council. According to Plaintiffs, the Beeson firm and Mr. Bonsall are closely aligned with Mr. Aloise, provided campaign assistance to Ms. Alvarado, and also engaged in election-related misconduct on behalf of Mr. Aloise and/or Ms. Alvarado. Hereinafter, the defendants in the second lawsuit shall be referred to collectively as the Bonsall Defendants.

Currently pending before the Court is a motion to dismiss in each case. In addition, Plaintiffs have moved for leave to amend to add new claims in the *Aloise* lawsuit. With respect to the motion to amend, the Aloise Defendants have opposed amendment but, in the alternative, have moved to dismiss the new claims (assuming amendment is permitted).

Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby **GRANTS** the Aloise Defendants' motion to dismiss (Docket No. 31 in the *Aloise* case). The Court further **GRANTS** Plaintiffs' motion for leave to amend (Docket No. 38 in the *Aloise* case), and, as to the amended claims, the Court **GRANTS** in part and **DENIES** in part the Aloise Defendants' motion to dismiss (Docket No. 44 in the *Aloise* case). Finally, the Court **GRANTS** the Bonsall Defendants' motion to dismiss (Docket No. 16 in the *Bonsall* case).

## I.     <u>FACTUAL & PROCEDURAL BACKGROUND</u>

In their complaints, Plaintiffs allege as follows.[1]

The IBT is an organization that represents workers throughout the United States. Through its affiliated local unions, the IBT has approximately 1.4 million members in a wide range of

---

[1] The *Aloise* complaint and the *Bonsall* complaint are largely the same. For ease of reference, the Court largely cites to the *Aloise* complaint.

industries. *See* Aloise Compl. ¶ 13.

The Joint Council is "an intermediate body" within the IBT. "[T]hrough its affiliated local unions[,] [the Joint Council] represents approximately 100,000 members who work in a variety of industries throughout Northern California, including members working in the cannery and food processing industry. Its main office is in San Francisco, California." Aloise Compl. ¶ 5. During the relevant period of events, Mr. Aloise was the President of the Joint Council. He was also the principal officer for an IBT local union, Teamsters Local Union No. 853 ("Local 853"). *See* Aloise Compl. ¶ 7.

Local 601 is an IBT local union affiliated with the Joint Council. *See* Aloise Compl. ¶ 6. During the relevant period of events, Ms. Alvarado was the principal officer of Local 601. *See* Aloise Compl. ¶ 8.

During the relevant period of events, Mr. Pimentel and Mr. Salas were members of Local 601. *See* Aloise Compl. ¶¶ 3-4. (Currently, Ms. Salas is still a union member but not Mr. Pimentel, who resigned his union membership in October 2016. *See* Docket No. 38 (Mot. at 1).)

The Beeson law firm provides legal services to both the Joint Council and Local 601. *See* Aloise Compl. ¶ 10. Mr. Bonsall is a senior shareholder at the Beeson firm. He has served as counsel for both the Joint Council and Local 601. *See* Aloise Compl. ¶ 11.

In December 2013, there was a regularly scheduled election for officers for Local 601. Ms. Alvarado, the incumbent principal officer for Local 601, headed one slate of candidates (the Alvarado Slate), which was strongly supported by Mr. Aloise. *See* Aloise Compl. ¶¶ 8, 11, 47. Plaintiffs were part of a different slate of candidates, known as the Pimentel Slate. *See* Aloise Compl. ¶¶ 3-4, 49. The Alvarado Slate defeated the Pimentel Slate, *see* Aloise Compl. ¶ 31, as well as another competing slate known as the Reyes Slate. *See* Docket No. 38 (IRO Op. at 21) (noting that the head of this slate was Juanlucio Reyes).

Shortly after the election, "Plaintiffs submitted a post-election protest[,] pursuant to the short time requirements of the IBT Constitution[,] based upon the limited information they had acquired regarding election improprieties committed by [Ms.] ALVARADO and her supporters,

3

including [Mr.] ALOISE."[2]  Aloise Compl. ¶ 32.  Under the IBT Constitution, the protest was to be heard by the Joint Council, which, as noted above, had Mr. Aloise as its President.  *See* Aloise Compl. ¶ 33.

Mr. Aloise appointed a hearing panel to consider Plaintiffs' post-election protest.  A hearing was held in February 2014.  In June 2014, the Joint Council panel rejected Plaintiffs' protest and confirmed the election of Ms. Alvarado and her slate.  The IBT subsequently confirmed the Joint Council's ruling.  *See* Aloise Compl. ¶ 34.

After the IBT issued its decision, Mr. Pimentel submitted charges to the Independent Review Board ("IRB"), asserting election-related misconduct and other wrongdoing by both Mr. Aloise and Ms. Alvarado.  *See* Aloise Compl. ¶ 35.  The IRB is a three-member body that was established by a consent decree in 1989 after the IBT and officers were charged with violations of RICO.  *See* Aloise Compl. ¶¶ 25-26.  "The mandate of the IRB included the investigation of any allegations of . . . corruption, including bribery, embezzlement, extortion, loan sharking," and so forth.  Aloise Compl. ¶ 27.  After investigating, the IRB has the power "to issue a written report detailing its findings, charges and recommendations concerning the discipline of union officers, members, employees and representatives."  Aloise Compl. ¶ 28.  Any recommendations of discipline are submitted to the IBT, and the IBT is required to take whatever action is appropriate under the IBT Constitution.  *See* Aloise Compl. ¶ 29.  "If the IRB determines the IBT response is inadequate to remedy the defects found by the IRB it must convene a hearing on the matter before the Independent Review Officer ('IRO').  Following hearing, the IRO issues a final and binding

---

[2] It appears that Plaintiffs' protest was based on factual allegations different from those asserted in the instant case – *e.g.*, that

> [Ms.] Alvarado and her supporters: (1) offered tickets to a raffle for $1,000 in exchange for votes; (2) improperly obtained and used members' contact information; (3) campaigned at an employer's property where other slates' members were not permitted to enter; (4) gave out turkeys in exchange for votes; (5) intimidated a member to vote for [Ms.] Alvarado; (6) tampered with ballots; and (7) manipulated rules and procedures for ballot counting to benefit [Ms.] Alvarado.

Docket No. 38 (IRO Op. at 27 n.15).

1    determination of the findings and remedy to be taken," and "[s]uch decision is judicially

2    enforceable."  Aloise Compl. ¶ 30.

3          The IRB initiated an investigation based on Mr. Pimentel's charges.  Throughout the

4    course of the IRB investigation, Plaintiffs were contacted.  *See* Aloise Compl. ¶ 36.  In February

5    2016,

6                      the IRB issued a 122-page Report of its findings and
                       recommendations concerning [Mr.] Aloise based on misconduct
7                      committed in his capacity as International Vice-President [of ITB],
                       Joint Council 7 President[,] and principal officer of Teamsters Local
8                      853, including unlawful conduct he engaged in involving the Local
                       601 election of officers.  [¶] The IRB report also documented
9                      wrongdoing committed by [Ms.] ALVARADO related to the
                       conduct of the 2013 election of [o]fficers of Local 601.[3]
10

11   Aloise Compl. ¶¶ 37-38.  (A copy of parts of the IRB report can be found at Docket No. 49-1

12   (Absalom Reply Decl., Ex. H).  The IRB report indicates that "[Mr.] Aloise engaged in a

13   pervasive pattern of violative conduct in connection with the Local 601 election in 2013" – *e.g.*, he

14   "us[ed] union resources and equipment to support [Ms.] Alvarado and to undermine her opponents

15   in the Local 601 election"; he "used Joint Council letterhead in an attempt to stop [Mr.] Pimentel

16   form circulating, as was his right to do, photographs of [Ms.] Alvarado in the campaign with the

17   threat of a retaliatory bogus charge"; etc.  Docket No. 49-1 (Absalom Reply Decl., Ex. H) (IRB

18   Report at 108, 116).)

19         Although the IBT was supposed to conduct a hearing based on the IRB report, it failed to

20   do so.  *See* Aloise Compl. ¶¶ 39-40.  "After repeated delays, the IBT sent a letter to the IRB

21   advising that it would not convene a hearing on the charges against [Mr.] ALOISE and purporting

22   to refer the matter back to the IRB."  Aloise Compl. ¶ 40.

23         Thereafter, the IRO became involved and held a hearing in May 2017.  In October 2017,

24   the IRO (former District Judge Barbara Jones) found Mr. Aloise guilty of the charges made by the

25   IRB, including those related to his conduct involving the Local 601 election.  (A copy of the IRO

26

27   _____
     [3] The IRB report recommended charges against Mr. Aloise only, and not Ms. Alvarado – thus,
28   Plaintiffs' use of the word "documented" vis-à-vis Ms. Alvarado.  *See also* Docket No. 49-1
     (Absalom Decl., Ex. H) (IRB report).

United States District Court
Northern District of California

opinion can be found at Docket No. 38. The IRO found, *inter alia*, that Mr. Aloise's "repeated use of Union resources in support of [Ms.] Alvarado's 2013 re-election campaign brought reproach upon the IBT." Docket No. 38 (IRO Op. at 52).)   In December 2017, the IRO issued a supplemental decision under which Mr. Aloise was suspended and banned from all official positions he held within the Teamster organization for two years. *See* Aloise Compl. ¶¶ 41-43; *see also* Docket No. 51-4 (Palitz Reply Decl., Ex. D) (Supp. IRO Op. at 11).

According to Plaintiffs, they did not know everything about Mr. Aloise and Ms. Alvarado's misconduct – or for that matter the Bonsall Defendants' misconduct – until the IRB issued its report in February 2016. *See* Aloise Compl. ¶ 44. It appears that Plaintiffs' complaints in the related cases before the Court are largely based on the IRB report and/or IRO opinion that issued thereafter. Because Plaintiffs' complaints refer to the IRO opinion, *see, e.g.*, Aloise Compl. ¶ 43, and because Plaintiffs have provided a copy of that opinion in support of their motion for leave to amend in the *Aloise* lawsuit, *see* Docket No. 38 (IRO opinion), the Court has relied on the opinion to better understand the allegations in Plaintiffs' complaints. *See La. Mun. Police Emples. Ret. Sys. v. Wynn*, 829 F.3d 1048, 1063 (9th Cir. 2016) (stating that "courts ruling on a motion to dismiss 'must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice'").

A.    Mr. Aloise

According to Plaintiffs, Mr. Aloise engaged in the following election-related misconduct.[4] (As noted above, the election took place in December 2013.)

- From February to July 2013, Mr. Aloise made threats to Mr. Hailstone, a former business agent for Local 948.

  o For example, in February 2013, Mr. Aloise sent an email (from his Teamster's email account) that stated: "'Rumor has it that you or someone

---

[4] In their complaint, Plaintiffs also claim misconduct by Mr. Aloise that is not related to the election. *See, e.g.*, Aloise Compl. ¶¶ 59-62 (alleging, *e.g.*, that Mr. Aloise solicited jobs for family members or close associates from employers). However, now that Plaintiffs have dropped certain causes of action from their complaint, that alleged misconduct is largely immaterial.

6

that is being advised you are planning to become involved in the Local 601 election.  I hope that is not true. . . . 948 is open season, I understand that, *but I don't want any interference in Local 601*.'"  Docket No. 38 (IRO Op. at 21) (emphasis added); *see also* Aloise Compl. ¶ 50; Docket No. 51-1 (Palitz Reply Decl., Ex. A) (email from Mr. Aloise to Mr. Hailstone).

- o  In May 2013, after learning that Mr. Hailstone had not heeded his warning, Mr. Aloise sent another email to Mr. Hailstone, stating: "'Let me make it clear *anyone who runs against [Ms. Alvarado] is running against me and I will treat them accordingly from now on and forever*.'"  Docket No. 38 (IRO Op. at 21) (emphasis added); *see also* Aloise Compl. ¶ 51; Docket No. 51-2 (Palitz Reply Decl., Ex. B) (email from Mr. Aloise to Mr. Hailstone). This email was also sent from Mr. Aloise's Teamster's e-mail account.  *See* Docket No. 38 (IRO Op. at 21).

- o  In July 2013, Mr. Aloise told Mr. Hailstone to broadcast a message to others that "'anyone who sticks his nose into 601 from the outside will never be paid by any local, council or sit on a fund again.  In case you know anyone tell [them] I don't make threats[,] just promises.'"  Aloise Compl. ¶ 56; *see also* Docket No. 51-3 (Palitz Reply Decl., Ex. C) (email from Mr. Aloise to Mr. Hailstone).

- In or about July 2013, Mr. Aloise provided Ms. Alvarado with assistance on a matter that posed a political problem for her.  *See* Docket No. 38 (IRO Op. at 28-29); *see also* Aloise Compl. ¶ 57.  The underlying events were as follows.  In 2011, the IBT conducted an audit of Local 601.  At the time of the audit, Ms. Alvarado was the principal officer for Local 601 but she did not have that position for the period being audited.  One of the audit's results was a finding that "the Local's sabbatical policy was 'convoluted' and lacked specificity.  The auditor instructed the Local to review its sabbatical policy and 'adopt a specific policy' . . . .  In addition, the auditor requested that the Local 'list accrued vacation and sabbatical

as an obligation on the Trustee's Report.'" Docket No. 38 (IRO Op. at 27-28). By October 2011, the auditor's instructions had not been followed and so, the General Secretary-Treasurer for the IBT contacted Local 601. In January 2012, the General Secretary-Treasurer reached out a second time after getting no response from Local 601. This time, Ms. Alvarado responded, indicating that measures were being taken, but, "as of March 2013, none of what [she] claimed that the Local would do to comply with the auditor's recommendations had been completed." Docket No. 38 (IRO Op. at 28). On March 1, 2013, the General Secretary-Treasurer asked for an update. Two months later, he advised Ms. Alvarado that he was still waiting for a response. This led to Ms. Alvarado getting advice from Mr. Bonsall of the Beeson law firm. In June 2013, Mr. Bonsall advised Ms. Alvarado, *inter alia*, that, instead of revising Local 601's sabbatical policy, she should just eliminate it altogether; however, he also advised that she should wait until after the December 2013 election to address the sabbatical policy because it could create a political problem for her during an election year. Mr. Bonsall further advised Ms. Alvarado to confer with Mr. Aloise on the matter. *See* Docket No. 38 (IRO Op. at 28-29). Ms. Alvarado did reach out to Mr. Aloise and he agreed to talk to the General Secretary-Treasurer on her behalf. Thereafter, the General Secretary-Treasurer did not send any more inquiries until September 2015 (well after the December 2013 election), in conjunction with an audit of a different period. *See* Docket No. 38 (IRO Op. at 29-30).

- In or about August 2013, Mr. Aloise used a union computer to create a promotional leaflet and, through his union email account, proposed that Ms. Alvarado "use it to attack and 'destroy' one of her rivals, [Mr.] Reyes [*i.e.*, the head of the Reyes Slate]." Docket No. 38 (IRO Op. at 21); *see also* Aloise Compl. ¶ 52. Mr. Aloise also "provided advice on how and where to distribute the leaflets." Docket No. 38 (IRO Op. at 21).

United States District Court
Northern District of California

- In October 2013, a Joint Council panel held a hearing on a disciplinary complaint that Plaintiffs had filed against Ms. Alvarado and other union officers. (The charges were that Ms. Alvarado and the others had "violated the IBT Constitution and Local Bylaws by paying business agents and other staff wages never discussed with or approved by the executive board or the general membership" and that Ms. Alvarado "brought reproach on the union by knowingly associating with a convicted felon." Docket No. 38 (IRO Op. at 22 n.11); *see also* Docket No. 31-5 (Palitz Decl., Ex. D) (letter from Plaintiffs making charges against, *inter alia*, Ms. Alvarado). The panel ultimately concluded that Ms. Alvarado had not committed the alleged offenses. Shortly after the hearing, Ms. Alvarado and a Joint Council attorney (Mr. Provost) complained to Mr. Aloise that Mr. Pimentel had tried to take pictures of Ms. Alvarado during the hearing. Mr. Aloise had the attorney draft a letter, put the letter of Joint Council letterhead, signed the letter as Joint Council President, and sent it to both Plaintiffs. In the letter, Mr. Aloise warned Plaintiffs that "they could be in violation of an unidentified Joint Council rule that prohibits the taking of photographs at Joint Council hearings." Docket No. 38 (IRO Op. at 24). Mr. Aloise also warned Plaintiffs that, if pictures should surface, "'I am going to hold both of you accountable. That would be a chargeable offense and appropriate charges against you under the IBT Constitution would be brought.'" Docket No. 38 (IRO Op. at 24).

- During the same October 2013 hearing above, Mr. Aloise directed his associates on the Joint Council panel to ask Mr. Pimentel to identify the lawyer it "assumed had provided assistance to [him] in preparing his charges." Aloise Compl. ¶ 56; *see also* Mot. at 13 n.10 (providing the exchange); Docket No. 31-6 (Palitz Decl., Ex. E) (transcript from October 2013 hearing).

- In November 2013, *i.e.*, "as the [December 2013] election grew closer, [Mr.] Aloise continued to provide counsel [to Ms. Alvarado] via his union email on the most effective way to distribute misinformation to neutralize both of [her] rivals."

Docket No. 38 (IRO Op. at 21). For example, Mr. Aloise instructed Ms. Alvarado that she should have third parties distribute campaign literature falsely accusing the Pimentel Slate of attacking the Reyes Slate. *See* Aloise Compl. ¶ 52.

- In or about November 2013, Mr. Aloise asked an outside vendor to design literature for Ms. Alvarado's campaign. *See* Docket No. 38 (IRO Op. at 22). The vendor was an employer prohibited from contributing to Ms. Alvarado's campaign. *See* Aloise Compl. ¶ 52. "An associate of the vendor communicated with [Mr.] Aloise over his union e-mail account, on design suggestions. The vendor's creations were apparently never distributed in the campaign, nor was the vendor paid." Docket No. 38 (IRO Op. at 22).

- In November 2013, Mr. Aloise had a lawyer at the Beeson firm draft a letter for distribution to principal officers within the Joint Council, advising them not to work with Plaintiffs' counsel of record, Mr. Absalom. *See* Docket No. 38 (IRO Op. at 24); *see also* Aloise Compl. ¶¶ 56, 67. The events that led to issuance of the letter were as follows. In October 2013, Plaintiffs filed a defamation lawsuit against Mr. Ramirez, a member of Local 601 and part of the Alvarado Slate, "for allegedly disseminating pro-Alvarado leaflets that contained accusations that [Plaintiffs] were convicted felons." Docket No. 38 (IRO Op. at 24); *see also* Aloise Compl. ¶ 67. Plaintiffs' lawyer in the defamation lawsuit was the same lawyer as in the present lawsuits – *i.e.*, Mr. Absalom. Mr. Ramirez was represented by the Beeson law firm. *See* Docket No. 38 (IRO Op. at 24). Mr. Aloise put the letter to principal officers on Joint Council letterhead. In the letter – which was also read to all delegates attending "the Joint Council Delegates meeting in December 2013," Aloise Compl. ¶ 72 – Mr. Aloise stated, *inter alia*, that Mr. Absalom "'recently filed a lawsuit against a Teamster who supports the reelection of [Ms.] Alvarado, Secretary-Treasurer of Teamsters Local 601. In my opinion, this lawsuit appears politically motivated and calculated to chill Teamster members from getting involved in their Local Union election. . . . If your Local Union currently retains

[Mr.] Absalom as legal counsel, you may want to consider another Union side law firm.'" Docket No. 38 (IRO Op. at 25). In an email to a lawyer for Local 853, Mr. Aloise commented that Mr. Absalom "'is definitely tied into Lucio Reyes [*i.e.*, the head of the Reyes Slate] and [Mr.] Hailstone (a retired Teamster official) who have formed this unholy alliance to remove [Ms. Alvarado]. This will happen over my dead body.'" Aloise Compl. ¶ 56.

- In November 2013, Mr. Bonsall of the Beeson law firm, emailed Mr. Aloise about Mr. Pimentel's campaign manager, Mr. Romero. Mr. Bonsall "laid out . . . two options for attacking [Mr.] Romero as a means to damage [Mr.] Pimentel's campaign." Docket No. 38 (IRO Op. at 25). "The second option would involve [Mr.] Aloise or Barry Broad [a legislative representative for a Teamsters state lobbying organization] contacting politicians for whom [Mr.] Romero [purportedly] worked to express to the politicians their 'great displeasure that someone from [the politicians'] staff was getting deeply involved in the politics of a Local Union within [the politicians'] jurisdiction.'" Docket No. 38 (IRO Op. at 25-26). Mr. Aloise used his union email to send an email to Mr. Broad and another individual (Mr. Bloch, the political coordinator for the Joint Council) asking that they "'check this out and if [Mr. Romero] is in fact working for these people [the politicians,] I want them to have an earful and let them know that this will be a problem for them now and in the future. Let me know what you find out. [Mr. Romero] is doing the work for the person running against [Ms.] Alvarado." Docket No. 38 (IRO Op. at 26); *see also* Aloise Compl. ¶ 56. As it turned out, Mr. Romero had never worked for a politician but at most had been a campaign volunteer. *See* Docket No. 38 (IRO Op. at 26).

B.   <u>Ms. Alvarado</u>

According to Plaintiffs, Ms. Alvarado's election-related misconduct was as follows:

- Ms. Alvarado accepted assistance from Mr. Aloise, the Beeson law firm, and Mr. Bonsall to promote her campaign for re-election. *See* Aloise Compl. ¶ 76.

1       •   Ms. Alvarado used Local 601 money to pay the Beeson law firm and Mr. Bonsall

2            for their campaign assistance. *See* Aloise Compl. ¶ 77.

3       •   Ms. Alvarado benefited from Mr. Bonsall's advice and Mr. Aloise's influence so

4            that she did not have to take action and get rid of Local 601's sabbatical policy

5            until after the December 2013 election was over. *See* Aloise Compl. ¶¶ 81-86.

6   C.     <u>Beeson Law Firm and Mr. Bonsall</u>

7       Finally, Plaintiffs charge the Beeson law firm and Mr. Bonsall with the following election-

8 related misconduct:

9       •   The Beeson firm and Mr. Bonsall represented Mr. Ramirez, the individual who was

10            a part of the Alvarado Slate and whom Plaintiffs sued for defamation. Local 601

11            paid Mr. Ramirez's attorney's fees. *See* Aloise Compl. ¶¶ 67-70.

12       •   At Mr. Aloise's request, the Beeson firm and Mr. Bonsall drafted the letter that

13            attacked Mr. Absalom for representing Plaintiffs in the defamation lawsuit against

14            Mr. Ramirez. *See* Aloise Compl. ¶ 71.

15       •   Mr. Bonsall advised Mr. Aloise to attack Mr. Pimentel's campaign manager. *See*

16            Aloise Compl. ¶ 75.

17       •   The Beeson firm and Mr. Bonsall were paid for their campaign assistance to Ms.

18            Alvarado with Local 601 monies. *See* Bonsall Compl. ¶ 61.

19       Based on, *inter alia*, the above allegations, Plaintiffs initially brought three claims in the

20 first lawsuit against the Aloise Defendants:

21       (1) Violation of the Labor Management Reporting and Disclosure Act of 1959

22            ("LMRDA). *See* 29 U.S.C. § 411(a)(1), (2), (4); *id.* § 412.

23       (2) Breach of contract, namely the IBT Constitution and/or Local 601 bylaws. *See* 29

24            U.S.C. § 185(a) (also known as § 301(a) of the Labor Management Relations Act

25            ("LMRA")).

26       (3) Civil RICO (against Mr. Aloise only). *See* 18 U.S.C. § 1962(c).

27 After the Aloise Defendants moved to dismiss, Plaintiffs dropped the second and third causes of

28 action, thus leaving only the LMRDA claim. However as noted above, Plaintiffs are now moving

for leave to add new LMRDA claims to this case.  *See* 29 U.S.C. § 501(a).

As for the second lawsuit, Plaintiffs initially asserted three claims against the Bonsall Defendants:

> (1) Aiding and abetting in violation of the LMRDA.
>
> (2) Conspiracy in violation of the LMRDA.
>
> (3) Breach of fiduciary duty in violation of California Civil Code § 2322(c) and the California common law.

After the Bonsall Defendants moved to dismiss, Plaintiffs dropped the third cause of action, thus leaving only the LMRDA aiding and abetting and conspiracy claims.

## II.     ALOISE DEFENDANTS' MOTION TO DISMISS (DOCKET NO. 31)

A.     Legal Standard

> To survive a [12(b)(6)] motion to dismiss for failure to state a claim after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), [a plaintiff's] factual allegations [in the complaint] "must . . . suggest that the claim has at least a plausible chance of success."  In other words, [the] complaint "must allege 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"
>
> . . . . [The Ninth Circuit has] settled on a two-step process for evaluating pleadings:
>
>> First, to be entitled to the presumption of truth, allegations in a complaint or counterclaim may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively.  Second, the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation.

*Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1134-35 (9th Cir. 2014).

Notably,

> [t]he plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility 'of entitlement to relief.'"

*Iqbal*, 556 U.S. at 678.

B.      General Background on the LMRDA

As noted above, LMRDA stands for the Labor Management Reporting and Disclosure Act of 1959. "The principal reason for the enactment of the LMRDA was to correct widespread abuses of power and instances of corruption by union officials, and to encourage democratic self-governance in unions." *Franza v. Int'l Bhd. of Teamsters, Local 671*, 869 F.2d 41, 44 (2d Cir. 1989). The Act is made up of seven titles. *See Wirtz v. Hotel, Motel and Club Emps. Union, Local 6*, 391 U.S. 492, 497 (1968).

For purposes of the pending motions, the Court need consider only two of the seven titles – namely, Title I and Title V. Currently, the only claims being asserted against the Aloise Defendants are based on Title I. Plaintiffs, however, ask for leave to amend to add Title V claims against the Aloise Defendants. No claims are being brought based on Title IV of the LMRDA because, even though that title deals with elections specifically,[5] "[a] complaint filed with the Secretary of Labor is the exclusive means of resolving disputes governed by Title IV." *Casumpang v. ILWU, Local 142*, 269 F.3d 1042, 1056 (9th Cir. 2001) (referring to the exclusivity provision codified at 29 U.S.C. § 483, also known as LMRDA § 403). Under Title IV, the Secretary may bring a civil action against a labor organization to set aside an invalid election. *See id.* The Ninth Circuit has noted that

> "the exclusivity provision included in § 403 of Title IV plainly bars Title I relief when an individual union member challenges the validity of an election that has already been completed." [However,] the [Supreme] Court [has] explained the limited scope of § 403.

_____

[5]

> Title IV "sets up a statutory scheme governing the election of union officers, fixing the terms during which they hold office, requiring that elections be by secret ballot, regulating the handling of campaign literature, requiring a reasonable opportunity for the nomination of candidates, authorizing unions to fix 'reasonable qualifications uniformly imposed' for candidates, and attempting to guarantee fair union elections in which all the members are allowed to participate." In general terms, "Title IV's special function in furthering the overall goals of the LMRDA is to insure 'free and democratic' elections" . . . .

*Local No. 82, Furniture & Piano Moving v. Crowley*, 467 U.S. 526, 539 (1984).

> "This does not necessarily mean that § 403 forecloses the availability of all postelection relief under Title I. The exclusivity provision of Title IV may not bar postelection relief for Title I claims or other actions that do not *directly* challenge the validity of an election already conducted."

*Casumpang v. ILWU, Local 14*2, 269 F.3d 1042, 1056 (9th Cir. 2001) (emphasis in original). "[T]he operation of Title IV preemption in election-related tort actions turns on two factors: (1) whether the type of relief sought will interfere with the operation of a union pursuant to an already-conducted election, and (2) whether a plaintiff may obtain relief under Title IV for the type of injury he or she claims to have suffered."[6] *Id.* at 1057.

### 1. Title I

"As originally introduced in the Senate, the LMRDA only contained what are now Titles II through VI, which establish disclosure requirements and rules governing union trusteeships and elections." *Franza*, 869 F.2d at 44. "Title I was hastily written on the floor to mollify fears that the bill before the Senate inadequately protected union members from abusive or coercive leadership practices." *Id.*

For purposes of the instant case, the relevant provisions in Title I are § 411(a)(1), (2), and (4). The exact text of each provision is provided below.

Section 411(a)(1) provides:

> Equal rights. Every member of a labor organization shall have equal rights and privileges within such organization **to nominate candidates**, **to vote in elections** or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws.

29 U.S.C. § 411(a)(1) (emphasis added).

---

[6] It appears that Plaintiffs did ask the Secretary of Labor to set aside the December 2013 election pursuant to Title IV. *See* Defs.' RJN, Ex. A (letters from Department of Labor to Plaintiffs, dated May 15, 2014, and July 14, 2014) (stating that, "[f]ollowing a review of the investigative findings by this office and the Office of the Solicitor, Division for Civil Rights and Labor-Management, a decision has been made that those findings do not provide a basis for action by the Department to set aside the protested election"; also stating that "no violation of the LMRDA occurred during the conduct of the election that may have affected the outcome of the election").

Section 411(a)(2) provides:

> Freedom of speech and assembly. Every member of any labor organization shall have the right to meet and assemble freely with other members; and **to express any views, arguments, or opinions**; and **to express at meetings of the labor organization his views, upon candidates in an election of the labor organization** or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: Provided, That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.

*Id.* § 411(a)(2) (emphasis added).

Finally, § 411(a)(4) provides:

> Protection of the right to sue. No labor organization shall limit the right of any member thereof **to institute an action in any court**, or in a proceeding before any administrative agency, irrespective of whether or not the labor organization or its officers are named as defendants or respondents in such action or proceeding, or the right of any member of a labor organization to appear as a witness in any judicial, administrative, or legislative proceeding, or to petition any legislature or to communicate with any legislator: Provided, That any such member may be required to exhaust reasonable hearing procedures (but not to exceed a four-month lapse of time) within such organization, before instituting legal or administrative proceedings against such organizations or any officer thereof: And provided further, That no interested employer or employer association shall directly or indirectly finance, encourage, or participate in, except as a party, any such action, proceeding, appearance, or petition.

*Id.* § 411(a)(4) (emphasis added).

2.     Title V

The purpose of Title V of the Labor-Management Reporting and Disclosure Act is to insure that members who think that union officers have violated their fiduciary duties shall be able to hold those individual officers responsible in a court of law. The real beneficiaries of a successful § 501 action are the union and its entire membership.

*Kerr v. Shanks*, 466 F.2d 1271, 1277 (9th Cir. 1972).

One of Title V's main provisions provides:

> Duties of officers; exculpatory provisions and resolutions void. The

officers, agents, shop stewards, and other representatives of a labor organization occupy positions of trust in relation to such organization and its members as a group. It is, therefore, the duty of each such person, taking into account the special problems and functions of a labor organization, to hold its money and property solely for the benefit of the organization and its members and to manage, invest, and expend the same in accordance with its constitution and bylaws and any resolutions of the governing bodies adopted thereunder, to refrain from dealing with such organization as an adverse party or in behalf of an adverse party in any matter connected with his duties and from holding or acquiring any pecuniary or personal interest which conflicts with the interests of such organization, and to account to the organization for any profit received by him in whatever capacity in connection with transactions conducted by him or under his direction on behalf of the organization. A general exculpatory provision in the constitution and bylaws of such a labor organization or a general exculpatory resolution of a governing body purporting to relieve any such person of liability for breach of the duties declared by this section shall be void as against public policy.

29 U.S.C. § 501(a).

C.    Section 411(a)(1) Claim Under Title I

Section 411(a)(1) protects the right of union members to, *e.g.*, nominate candidates and to vote in elections. Plaintiffs have failed to address the Aloise Defendants' arguments on Plaintiffs' failure to adequately plead a § 411(a)(1) violation. *See, e.g.*, Mot. at 10 (noting that "Plaintiffs *did* run for election and presumably voted") (emphasis in original). Therefore, Plaintiffs' § 411(a)(1) claim is dismissed with prejudice.

D.    Section 411(a)(4) Claim Under Title I

Section 411(a)(4) protects the right of union members "to institute an action in any court, . . . irrespective of whether or not the labor organization or its officers are named as defendants." 29 U.S.C. § 411(a)(4). It is clear from both the complaint and Plaintiffs' opposition that this claim is based *solely* on the letter Mr. Aloise wrote condemning Plaintiffs' attorney Mr. Absalom.

So understood, there are two problems with Plaintiffs' § 411(a)(4) claim. First, there is no indication that Plaintiffs sustained any injury as a result of the letter. *See Cent. Delta Water Agency v. United States*, 306 F.3d 938, 946-47 (9th Cir. 2002) (stating that, in order for a party to have standing to bring a lawsuit, a "plaintiff must have suffered an 'injury in fact'" – *i.e.*, "an invasion of a legally protectable interest which is both 'concrete and particularized,' as well as

17

'actual or imminent, not conjectural or hypothetical'"); *see also In re Facebook Internet Tracking Litig.*, 140 F. Supp. 3d 922, 928 (N.D. Cal. 2015) (noting that "[a] facial 12(b)(1) motion involves an inquiry confined to the allegations in the complaint, whereas a factual 12(b)(1) motion permits the court to look beyond the complaint to extrinsic evidence[;] [w]hen, as here, a defendant makes a facial challenge, all material allegations in the complaint are assumed true, and the court must determine whether lack of federal jurisdiction appears from the face of the complaint itself"). It does not appear, for example, that Plaintiffs were deterred from maintaining their defamation lawsuit against Mr. Ramirez. Nor is there any indication that the letter deterred Plaintiffs from initiating any other lawsuit. To the extent Plaintiffs argue that the letter would have deterred a reasonable union member from filing suit, that is beside the point: Plaintiffs still need to show some kind of impact on themselves in order to have standing. Plaintiffs have not shown that they may assert the rights of a third party. *See Mills v. United States*, 742 F.3d 400, 406-07 (9th Cir. 2014) (noting that "the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties," although "[i]t may be necessary to grant a third party standing to assert the rights of another when (1) the party asserting the right has a close relationship with the person who possesses the right and (2) there is a hindrance to the possessor's ability to protect his own interests") (internal quotation marks omitted). And in any event, Plaintiffs have not alleged that the letter actually impacted another union member.

Second, the § 411(a)(4) claim is clearly time barred. *See In re Brocade Communs. Sys. Derivative Litig.*, 615 F. Supp. 2d 1018, 1035 (N.D. Cal. 2009) (noting that, "[i]f the expiration of the applicable statute of limitations is apparent from the face of the complaint, the defendant may raise a statute of limitations defense in a Rule 12(b)(6) motion to dismiss[;] [t]his is true even though expiration of the limitations period is an affirmative defense"). The parties agree that all of the Title I claims are subject to a two-year limitations period. *See Reed v. United Transportation Union*, 488 U.S. 319, 326-27, 334 (1989) (holding that LMRDA claims based on § 411(a)(2) are subject to state general or residual personal injury statutes of limitations); Cal. Code Civ. Proc. § 335.1 (providing for a two-year limitations period for personal injury actions). The letter

condemning Mr. Absalom was written and made public in late 2013. Plaintiffs, however, did not bring their § 411(a)(4) claim until 2018, *i.e.*, five years later. Thus, it is barred by the two-year statute of limitations.

Plaintiffs contend still that their § 411(a)(4) claim is not time barred because of (1) the delayed discovery rule and (2) equitable tolling. Neither contention is persuasive.

Under California law, "a cause of action accrues at 'the time when the cause of action is complete with all of its elements,'" but the delayed discovery rule provides for an exception – more specifically, "postpon[ing] accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action." *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 806-07 (2005). In the instant case, Plaintiffs claim that, although the letter was made public in late 2013, they did not actually learn about the letter condemning Mr. Absalom until the IRB report was issued in February 2016. But, as indicated above, a cause of action also accrues when a plaintiff has reason to discover the cause of action.

"A plaintiff has reason to discover a cause of action when he or she 'has reason at least to suspect a factual basis for its elements.'" *Id.* at 807. The California Supreme Court has noted that "we do not take a hypertechnical approach to the application of the discovery rule. Rather than examining whether the plaintiffs suspect facts supporting each specific legal element of a particular cause of action, we look to whether the plaintiffs have reason to at least *suspect that a type of wrongdoing has injured them.*" *Id.* (emphasis added); *see Stella v. Asset Mgmt. Consultants, Inc.*, 8 Cal. App. 5th 181, 192 (2017) (stating that "'[a] plaintiff need not be aware of the specific "facts" necessary to establish the claim; that is a process contemplated by pretrial discovery [but] [o]nce the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, she must decide whether to file suit or sit on her rights'"). "'So long as a suspicion exists, it is clear that the plaintiff must go find the facts; she cannot wait for the facts to find her.'" *Id.* Indeed, "plaintiffs are required to conduct a reasonable investigation after becoming aware of an injury, and are charged with knowledge of the information that would have been revealed by such an investigation." *Fox*, 35 Cal. 4th at 808 (discussing inquiry notice). In short, "under the delayed discovery rule, a cause of action accrues and the statute of limitations begins to run when the

1    plaintiff has reason to suspect an injury and some wrongful cause, unless the plaintiff pleads and

2    proves that a reasonable investigation at that time would not have revealed a factual basis for that

3    particular cause of action." *Id.* at 803.

4         In the instant case, Plaintiffs admit that they knew Mr. Aloise was engaging in wrongdoing

5    against them as early as October 2013, *i.e.*, when Mr. Aloise warned Plaintiffs about taking

6    photographs at a Joint Council hearing.  Moreover, Plaintiffs clearly suspected broader

7    wrongdoing by Mr. Aloise at the time when they submitted charges to the IRB in or about 2014.

8    Given Plaintiffs' suspicions, they had a duty to conduct a reasonable investigation and, given that

9    the letter condemning Mr. Absalom was publicly distributed and announced, a reasonable

10   investigation would have revealed the existence of the letter.  Thus, Plaintiffs are charged with

11   knowledge of the letter.  There is also a fair argument that a person with a reasonable degree of

12   awareness should have known about the letter in the first place given that it was publicly

13   distributed.  *Cf. Avila v. Willits Envtl. Remediation Trust*, 633 F.3d 828, 841, 843 (9th Cir. 2011)

14   (in CERCLA case, noting that "a limitations period does not begin until the date 'that [a plaintiff]

15   knows or reasonably should have known' of both the existence and the cause of the injury";

16   stating that "[t]he ever-increasing interest in health issues associated with the Remco

17   contamination . . . demonstrates that by August 24, 2000, people with a reasonable degree of

18   awareness should have known that contamination from Remco was a serious health concern and

19   made further inquiry").

20        Plaintiffs maintain that, even if they are not entitled to claim of the benefit of the delayed

21   discovery rule, they are still entitled to equitable tolling.  The Court does not agree.

22             Equitable tolling is a judicially created, nonstatutory doctrine
              designed to prevent unjust and technical forfeitures of the right to a
23            trial on the merits when the purpose of the statute of limitations –
              timely notice to the defendant of the plaintiff's claims – has been
24            satisfied.  Where applicable, the doctrine will suspend or extend a
              statute of limitations as necessary to ensure fundamental practicality
25            and fairness. . . .

26            Broadly speaking, the doctrine applies [w]hen an injured person has
              several legal remedies and, reasonably and in good faith, pursues
27            one. . . . Tolling eases the pressure on parties concurrently to seek
              redress in two separate forums with the attendant danger of
28            conflicting decisions on the same issue.

*Cal. Rest. Mgmt. Sys. v. City of San Diego*, 195 Cal. App. 4th 1581, 1593-94 (2011) (internal quotation marks omitted).

According to Plaintiffs, the running of the clock should be equitably tolled from the time that they filed a complaint with the IRB (this appears to have been some time in 2014) until December 2017, when those proceedings were completed with the issuance of the IRO opinion that sanctioned Mr. Aloise. But the IRB and related proceedings cannot count as the "first claim" filed by Plaintiffs because, even though Plaintiffs basically lodged a complaint with the IRB, Plaintiffs were not themselves parties to those proceedings. Notably, in *Hahn v. City of Carlsbad*, No. 15-cv-2007 DMS (BGS), 2016 U.S. Dist. LEXIS 79950 (S.D. Cal. Apr. 12, 2016), the district court pointed out that "equitable tolling is premised on the same plaintiff filing two separate claims (involving the same wrong and arising from the same events) in two different fora." *Id.* at *9-10. Thus, the court refused to deem a criminal prosecution as a claim brought by plaintiffs: a prosecution "can in no way be characterized as 'a good faith pursuit [by plaintiff] of a legal remedy designed to lessen the extent of [that] plaintiff's damages.'" Likewise lodging a complaint with the IRB does not constitute a claim for tolling purposes. In any event, even if the IRB complaint could provide a predicate for tolling, equitable tolling would not apply as of 2014, because there is no indication that Mr. Aloise was given timely notice of the IRB complaint against him. Indeed, equitable tolling is generally applied where the defendant was, by virtue of the first claim, given notice of plaintiff's intent to sue, thus alerting the defendant of the need, *e.g.*, to marshal and preserve evidence. Plaintiffs' complaint to the IRB did not provide such notice.

Accordingly, the Court dismisses the § 411(a)(4) claim. The claim is dismissed with prejudice because amendment would be futile, particularly in light of the time bar.

E.    Section 411(a)(2) Claim Under Title I

Section 411(a)(2) protects the right of union members to, *inter alia*, express any views, arguments, or opinion. Congress essentially intended this section "to restate a principal First Amendment value – the right to speak one's mind without fear of reprisal." *United Steelworkers of Am. v. Sadlowski*, 457 U.S. 102, 111 (1982) (but adding that "there is absolutely no indication that Congress intended the scope of § 101(a)(2) to be identical to the scope of the First

21

Amendment[;] [r]ather, Congress' decision to include a proviso covering 'reasonable' rules refutes that proposition"). In the instant case, Plaintiffs' § 411(a)(2) claim suffers from multiple problems.

First, parts of the claim are clearly time barred. For example, Plaintiffs suggest that their § 411(a)(2) rights were impacted when, in October 2013, Mr. Aloise warned Plaintiffs about taking photographs at a Joint Council hearing. But clearly, Plaintiffs knew about this alleged misconduct when it took place in October 2013. Plaintiffs have no justification for waiting until 2018 to file suit based on this action by Mr. Aloise.

Second, similar to above, there is no indication that any of the Aloise Defendants' conduct injured Plaintiffs, such as chilling them from engaging in speech. Indeed, at the hearing, Plaintiffs conceded that their speech was not chilled as a result of the Aloise Defendants' actions. Plaintiffs protest that they need only show that the Aloise Defendants' conduct would chill a reasonable union member's speech and that Defendants' campaign of attempted intimidation would likely have such a broader effect. But Plaintiffs must still show some kind of impact on themselves in order to have standing to sue.

At the hearing, Plaintiffs took the position that a § 411(a)(2) claim is viable so long as the defendant has simply engaged in a scheme to suppress dissent. In support, Plaintiffs cited *Johnson v. Kay*, 860 F.2d 529 (2d Cir. 1989), where the Second Circuit noted that there were "organized attempts by the defendants to prevent union members sympathetic to [the plaintiff-union officer] from expressing their views" and that the LMRDA protects against "'a deliberate attempt by union officials to suppress dissent within the union.'" *Id.* at 536-37. But Johnson is easily distinguishable from the instant case because, there, the plaintiffs in that case included not only the union officer but also five union members themselves whose dissent was suppressed. *See id.* at 532. Thus, there were no issues with standing.[7]

_____

[7] Even if Plaintiffs could assert the speech rights of third parties, Plaintiffs would have to claim that the speech rights of other union members specifically were infringed. Section 411(a)(2) refers to the right to express views and opinions held by "[e]very member of any labor organization." 29 U.S.C. § 411(a)(2). Plaintiffs' claim as to threats made to Mr. Hailstone is problematic because he is "a *retired* Teamster official." Compl. ¶ 56 (emphasis added). Although Mr. Aloise told Mr. Hailstone to broadcast his message that no one should interfere to others, there is no allegation that

22

1    Moreover, there is a fundamental problem with Plaintiffs' position as to much of the

2    alleged misconduct in that it is not clear how the Aloise Defendants' conduct could chill a

3    reasonable union member's speech given that, as argued by Plaintiffs in opposing a time bar, most

4    of the Aloise Defendants' conduct was not publicly known.[8]

5    Accordingly, the Court dismisses Plaintiffs' § 411(a)(2) claim.  As above, the dismissal is

6    with prejudice.  Plaintiffs failed at the hearing to articulate any basis by which they could cure the

7    deficiencies described above.

8    **III.**      **PLAINTIFFS' MOTION FOR LEAVE TO AMEND (DOCKET NO. 38)**

9    Although the Court is dismissing the Title I claims against the Aloise Defendants with

10   prejudice, that does not resolve the *Aloise* case because Plaintiffs have moved for leave to amend

11   to add Title V claims.  The Aloise Defendants oppose the motion to amend and, in the alternative,

12   move to dismiss the claims.[9]

13   The relevant provision of Title V – which covers a breach of a fiduciary duty – is as

14   follows:

15            Duties of officers; exculpatory provisions and resolutions void.  The
             officers, agents, shop stewards, and other representatives of a labor
16           organization occupy positions of trust in relation to such
             organization and its members as a group.  It is, therefore, the duty of
17           each such person, taking into account the special problems and
             functions of a labor organization, to hold its money and property
18           solely for the benefit of the organization and its members and to
             manage, invest, and expend the same in accordance with its
19           constitution and bylaws and any resolutions of the governing bodies
             adopted thereunder, to refrain from dealing with such organization
20

21   _____

     Mr. Hailstone did so.

22
     [8] At the hearing, Plaintiffs suggested that, once the information became publicly known, a
23   reasonable union member would have been chilled from speaking.  But by the time the
     information became publicly known – in February 2016 with the issuance of the IRB report – the
24   December 2013 election was well in the past.  Thus, it is not clear what damages could be
     claimed.  This is especially so since the IRB report issued after the 2013 election sanctioned and
25   thus remedied the misconduct.

26   [9] For convenience, the Court continues to refer to Plaintiffs, although technically only Mr. Salas is
     a proper plaintiff for the Title V claim because Mr. Pimentel is no longer a member of the union.

27
             For convenience, the Court also continues to refer to the Aloise Defendants but recognizes
28   that the Title V claims are being asserted against only the individual defendants, Mr. Aloise and
     Ms. Alvarado.

1        as an adverse party or in behalf of an adverse party in any matter
connected with his duties and from holding or acquiring any
2        pecuniary or personal interest which conflicts with the interests of
such organization, and to account to the organization for any profit
3        received by him in whatever capacity in connection with
transactions conducted by him or under his direction on behalf of the
4        organization.

29 U.S.C. § 501(a).  A union member may bring an action based on a violation of § 501(a) only "to recover damages or secure an accounting or other appropriate relief for the benefit of the labor organization."  *Id.* § 501(b).

In the proposed fourth cause of action, Plaintiffs claim a violation of § 501(a) by Mr. Aloise and, in the fifth cause of action, a violation of the same statute by Ms. Alvarado.

According to Plaintiffs, Mr. Aloise breached his fiduciary duties by, *inter alia*:

- "Failing to use reasonable care to preserve the resources and assets of Joint Council No. 7 for legitimate and permissible purposes" – *e.g.*, "[m]isusing Joint Council No. 7 assets to promote and assist the candidacy for election of ALVARADO and her slate [of] candidates."  Prop. FAC ¶ 113.

- Assisting Ms. Alvarado in putting off remedial action "to cure the unsustainable costs of the sabbatical leave policy of Local 601" so that it would not hurt her during the election.  Prop. FAC ¶ 113.

- "Obtaining and soliciting contributions by Employers, including the BEESON FIRM, to assist ALVARADO's campaign for office," which was a violation of § 481(g) (part of Title IV).  Prop. FAC ¶ 113.

- Trying to attack Mr. Pimentel's campaign manager.  *See* Prop. FAC ¶ 113.

- "Soliciting and accepting things of value from employers in violation of 29 U.S.C. Section 186."  Prop. FAC ¶ 113.

- Engaging in other election-related misconduct.  *See* Prop. FAC ¶ 113.

In terms of relief, Plaintiffs ask for, *inter alia*, "restitution to Local 601 and Joint Council 7 of all expenditures incurred as a result of Aloise's wrongful use of their assets, including attorney fees paid to the individual defendants' attorneys to defend this action and/or to provide assistance during the [2013] union election."  Prop. FAC ¶ 117.  Plaintiffs further ask for an injunction

requiring Mr. Aloise to stop using union assets for his own personal benefit or advancement.[10] *See* Prop. FAC, Prayer for Relief ¶ 3.

With respect to Ms. Alvarado, Plaintiffs make similar election misconduct allegations and similarly ask for a comparable injunction and "restitution . . . of all expenditures . . . incurred as a result of ALVARADO's wrongful use of their assets, including attorney fees expended to support her candidacy and to defend this action."[11]  Prop. FAC ¶¶ 130-31.

The Aloise Defendants argue first that Plaintiffs should not be allowed to amend because there is no "good cause" for them to bring any § 501(a) claims.  The Aloise Defendants' argument is predicated not on the Federal Rules of Civil Procedure (*e.g.*, Rule 15 or 16) but rather on § 501(b) which provides that no § 501(a) "proceeding shall be brought except upon leave of the court obtained upon verified application and for good cause shown."  29 U.S.C. § 501(b).

The Ninth Circuit has noted that the good cause requirement "is intended as a safeguard to the affected union against harassing and vexatious litigation brought without merit or good faith." *Horner v. Ferron*, 362 F.2d 224, 228 (9th Cir. 1966); *see also Cowger v. Rohrbach*, 868 F.2d 1064, 1068 (9th Cir. 1989) (stating that the good cause "showing protects union officials from harassing and vexatious litigation which has no merit and from unwarranted judicial intrusion in the processes of union democracy").  Therefore, a court does consider, to a certain extent, the merits of a case in determining whether there is good cause to support a § 501(a) claim.

However, the Ninth Circuit has not gone so far as to adopt the Second Circuit's approach to good cause – *i.e.* construing the term "to mean that [a] plaintiff must show a *reasonable likelihood of success* and, with regard to any material facts he alleges, . . . a reasonable ground for belief in their existence."  *Dinko v. Wall*, 531 F.2d 68, 75 (2d Cir. 1975).  In fact, no circuit court appears to have adopted the Second Circuit's approach, *see Hoffman v. Kramer*, 362 F.3d 308,

---

[10] At the hearing, Plaintiffs conceded that other injunctive relief sought – *i.e.*, vacating the Aloise Defendants from their positions as union officers – was not appropriate because it would run into conflict with Title IV.  The Court also notes that Mr. Aloise has been suspended from serving as a union official until 2020, which largely renders this specific injunctive relief moot as to him.

[11] To the extent the proposed FAC has allegations that suggest Plaintiffs seek damages or other relief for themselves, Plaintiffs have clarified that that is not their intent.

315 (5th Cir. 2004) (noting such), and several circuit courts have been explicitly critical of that approach. *See, e.g.*, *Loretangeli v. Critelli*, 853 F.2d 186, 191-92 (3d Cir. 1988) (noting, *inter alia*, that "[t]he statutory permission for plaintiffs to file an ex parte application for leave to sue, 29 U.S.C. § 501(b), suggests a low level of judicial scrutiny at this point[;] [t]he language of the statute certainly does not require that the district court then make a searching inquiry into the merits of the suit"); *George v. Local Union No. 639*, 98 F.3d 1419, 1422 (D.C. Cir. 1996) (stating that "[i]t would . . . be illogical to impose a heightened pleading standard, requiring a plaintiff to show a high likelihood of success on the merits").

Accordingly, the Court rejects the Aloise Defendants' position that the Second Circuit approach should be followed here in evaluating whether there is good cause for Plaintiffs' § 501(a) claims. Under the current Ninth Circuit approach, review is limited and designed simply to ensure that a suit is not frivolous or undertaken for the purpose of harassment. The Court finds that Plaintiffs have established good cause to amend. The allegations in the proposed amended complaint fairly put into question whether the Aloise Defendants breached their fiduciary duties by, *e.g.*, using union resources for their own personal purposes.

The Court also rejects the Aloise Defendants' argument that, as part of the good cause inquiry, the Court should consider whether the remedies sought by Plaintiffs "would realistically benefit the union and/or its membership." *Hoffman*, 362 F.3d at 316. According to the Aloise Defendants, there is no good cause for the § 501(a) claims in the instant case because the alleged breaches of fiduciary duty at best involve a "de minimis expenditure [of union resources by Mr. Aloise and/or Ms. Alvarado] that does not justify a federal lawsuit." *Id.* at 322 n.14.

The Aloise Defendants correctly point out that the Fifth Circuit – in *Hoffman* – expressly endorsed the above consideration as part of the good cause inquiry. Nevertheless, the Ninth Circuit has never adopted the Fifth Circuit's approach in *Hoffman*, and this Court is wary of doing so in the first instance absent Ninth Circuit authority. Moreover, even if *Hoffman* has some appeal, its application should be limited to cases in which it is fairly obvious that a suit would not be of any benefit to the union and/or its membership.

At this early stage of the proceedings, the Court cannot say that the instant action is such a

26

case. For example, it is not clear that the instant case involves de minimis expenses only, as claimed by the Aloise Defendants. This is especially true in light of Plaintiffs' contention that the Aloise Defendants used union attorneys to do personal, non-union work, with the union paying for the attorneys' fees. The Aloise Defendants point out that, as pled in the complaint, the Beeson law firm was paid on a monthly retainer; therefore, the firm was not charging the union *more* money than usual even if it was allegedly doing non-union work. But the fact that the union paid the attorneys on a monthly retainer does not insulate the class for restitution for misuse of a union asset. Under the Aloise Defendants' theory, union officers can appropriate legal services otherwise owed to the union simply because there is a fixed fee retainer; the union would be without any remedy against the misappropriation. Such a result would be at war with the fundamental purpose of Title V. Defendants cite no case law supporting their argument.

To the extent the Aloise Defendants express concern that Plaintiffs may ultimately obtain a victory, but only a small one that would be dwarfed by the attorney's fees that the union might have to pay for Plaintiffs' efforts on the union's behalf, the Court is not unsympathetic. However, a court has discretion to award fees under 29 U.S.C. § 501(b) (providing that "[t]he trial judge *may* allot a reasonable part of the recovery in any action under this subsection to pay for fees of counsel prosecuting the suit at the instance of the member of the labor organization and to compensate such member for any expenses necessarily paid or incurred by him in connection with the litigation") (emphasis added), and the achievement of only limited success or a limited benefit might well weigh against any significant fee award payable by the union. *Cf. Reyes v. Laborers' Int'l Union*, 464 F.2d 595, 597 (10th Cir. 1972) ("Recovery under the statute has not been restricted to a limited monetary recovery by the Union, but rather has included any benefit realized by the Union. The record does not reflect any benefit conferred on the Union by the institution of the action by Reyes."); *Monzillo v. Biller*, 735 F.2d 1456, 1463 (D.C. Cir. 1984) ("It is true that attorneys' fees can be awarded under this provision even where there has been no monetary recovery. But the courts have always insisted that, to justify such an award, the plaintiff must have 'rendered a substantial service to his union as an institution and to all of its members.'").

The Court therefore holds that the "good cause" requirement has been satisfied and turns to

the Aloise Defendants' motion to dismiss the Title V claims.

## IV.   ALOISE DEFENDANTS' MOTION TO DISMISS
## TITLE V CLAIMS (DOCKET NO. 44)

As an initial matter, the Court takes into account the Aloise Defendants' concession that the scope of § 501 is *not* limited to breaches of fiduciary duty involving the money and property of the union.  As Plaintiffs note, in *Stelling v. International Brotherhood of Electrical Workers*, 587 F.2d 1379 (9th Cir. 1978), the Ninth Circuit rejected the narrower view of § 501, *see Gurton v. Arons*, 339 F.2d 371 (2d Cir. 1964), and held that union officials have fiduciary duties even when no monetary interest of the union is involved.  The court added, however, that its decision did "not mean that courts have power to intervene in intra-union affairs at slight provocation or on any invitation.  Rather, we confirm the principles expressed in *Phillips v. Osborne*, 403 F.2d 826 (9th Cir. 1968), the judicial interference should be undertaken only with great reluctance." *Stelling*, 587 F.2d at 1387.  In *Stelling* itself, the court permitted a claim under § 501(a) which alleged that the union officers had failed "to submit a collective bargaining agreement to general membership vote in derogation of the union constitution." *Id.*; *see also Lodge 1380, Bhd. of Ry., Airline & S.S. Clerks v. Dennis*, 625 F.2d 819, 828-29 (9th Cir. 1980) (affirming holding in *Stelling*; "conclud[ing] that Lodge's allegation that Dennis wrongfully refused access to the membership lists and wrongfully denied the referendum vote does state a breach of fiduciary duty within LMRDA § 501").

Because the scope of § 501 is broad, the Court finds the bulk of the motion to dismiss without merit.  Plaintiffs can assert a breach of fiduciary duty even when no union money or property is at issue. *See, e.g.*, FAC ¶ 113 (alleging that Mr. Aloise obtained and solicited contributions by employers to assist Ms. Alvarado's campaign for office, tried to attack Mr. Pimentel's campaign manager, and solicited and accepted things of value from employers).  That being said, the Court acknowledges that, even though the § 501 claim as pled implicates more than just union money of property, much of the relief sought by Plaintiffs for the § 501 claim is related to the misuse of union money or property.  As noted above, Plaintiffs ask for "restitution to Local 601 and Joint Council 7 of all expenditures incurred as a result of" the Aloise Defendants'

wrongful use of union assets, Prop. FAC ¶ 117, and an injunction requiring the Aloise Defendants to stop using union assets for their own personal benefit of advancement. *See* Prop. FAC, Prayer for Relief ¶ 3.

Although a claim for restitution may lie, Plaintiffs' claim for injunctive relief is not warranted under the circumstances. Plaintiffs' only allegation is that the Aloise Defendants used union assets to support Ms. Alvarado's candidacy in the 2013 election, but there is no indication that, since the 2013 election, either Mr. Aloise or Ms. Alvarado has engaged in any such misconduct. Indeed, after the 2013 election, there was another election in 2016 and no challenge was made, either by Plaintiffs or other union members, that the Aloise Defendants engaged in any improper conduct, including misuse of union resources. Moreover, the IRO opinion issued relief as to Mr. Aloise at least. Therefore, Plaintiffs have not shown a likelihood they will be injured in the future and thus lack standing to bring their claim for injunctive relief. *See Gratz v. Bollinger*, 539 U.S. 244, 284 (2003) (noting that, in *Los Angeles v. Lyons*, 461 U.S. 95, 75 L. Ed. 2d 675, 103 S. Ct. 1660 (1983), the plaintiff "had standing to recover damages caused by 'chokeholds' administered by the police in the past but had no standing to seek injunctive relief preventing future chokeholds[;] petitioners' past injuries do not give them standing to obtain injunctive relief to protect third parties from similar harms").

To the extent the Aloise Defendants argue the Title V claims should be entirely dismissed based on the statute of limitations, the Court is not persuaded. The alleged misconduct underlying the Title V claims largely involves nonpublic information (*e.g.*, using union resources for personal benefit). That being the case, it is not clear that Plaintiffs reasonably should have uncovered the alleged misconduct even if they knew – as early as December 2013, when the election took place – that the Aloise Defendants were engaged in some kind of wrongdoing and Plaintiffs investigated such. "When a plaintiff reasonably should have discovered facts for purposes of the accrual of a cause of action or application of the delayed discovery rule is generally a question of fact, properly decided as a matter of law only if the evidence (or, in this case, the allegations in the complaint

and facts properly subject to judicial notice) can support only one reasonable conclusion."[12] *Stella*, 8 Cal. App. 5th at 193.

For the foregoing reasons, the Court grants in part and denies in part the Aloise Defendants' motion to dismiss the Title V claims. The motion is granted to the extent Plaintiffs seek injunctive relief for the Title V claims. The motion is otherwise denied.

Thus, for purposes of the *Aloise* case, only Title V claims remain in the action.

## V. BONSALL DEFENDANTS' MOTION TO DISMISS

With respect to the Bonsall Defendants, Plaintiffs contend that they aided and abetted the Aloise Defendants, and conspired with the Aloise Defendants, both in violation of the LMRDA.[13] The Bonsall Defendants contend that the LMRDA claims asserted against them should be dismissed for various reasons, but, for purposes of the pending motion, the Court addresses only two of those arguments – namely, (1) that the LMRDA allows only certain entities and persons to be sued and the Bonsall Defendants do not qualify as any of those entities or persons and (2) that the LMRDA does not provide for secondary liability.

### A. Proper Defendant Under the LMRDA

The Bonsall Defendants argue first that the LMRDA creates liability against certain enumerated actors only and that they do not qualify as any such actors. The Court agrees.

As an initial matter, the Court notes that Congress stated as follows in its declaration of findings, purposes, and policies for the act:

> [T]he enactment of this Act is necessary to eliminate or prevent improper practices *on the part of labor organizations, employers, labor relations consultants, and their officers and representatives* which distort and defeat the policies of the Labor Management Relations Act, 1947, as amended, and the Railway Labor Act, as amended, and have the tendency or necessary effect of burdening or obstructing commerce . . . .

29 U.S.C. § 401(c) (emphasis added); *see also id.* §§ 401(a), (b) (declaring it "essential that labor

---

[12] This ruling is not inconsistent with the Court's ruling above regarding a time bar as to some or part of Plaintiffs' Title I claims. For these Title I claims, there was "only one reasonable conclusion." *Stella*, 8 Cal. App. 5th at 193.

[13] Plaintiffs voluntarily dismissed all other claims asserted against the Bonsall Defendants in the *Bonsall* complaint.

organizations, employers, and their officials adhere to the highest standards of responsibility and ethical conduct in administering the affairs of their organizations" and that legislation will afford protection for employees and the public vis-à-vis "activities *of labor organizations, employers, labor relations consultants, and their officers and representatives*") (emphasis added).  Because Congress identified these persons and entities specifically, and not others, it is questionable that the LMRDA is intended to impact additional persons or entities.  Indeed,

> [i]t is a fundamental canon that where the "statutory text is plain and unambiguous," a court "must apply the statute according to its terms.  Further, the "doctrine of expressio unius est exclusio alterius 'as applied to statutory interpretation creates a presumption that when a statute designates certain persons, things, or manners of operation, all omissions should be understood as exclusions.'"

*Wheeler v. City of Santa Clara*, 894 F.3d 1046, 1054 (9th Cir. 2018).

In the instant case, the Bonsall Defendants clearly are not labor organizations, employers, or their officers or representatives.  Moreover, Plaintiffs have never claimed that the Bonsall Defendants should be considered labor relations consultants and, even if they had, that position would have dubious merit given the definition of the term in the LMRDA: "'Labor relations consultant' means any person who, for compensation, advises or represents an employer, employer organization, or labor organization *concerning employee organizing, concerted activities, or collective bargaining activities*."  29 U.S.C. § 402(m) (emphasis added).  Though the Bonsall Defendants might have advised or represented the unions at issue for compensation, there is no indication that their work as relevant in the instant case concerned "employee organizing, concerted activities, or collective bargaining activities."

Beyond the Congressional declaration discussed above, the text of the LMRDA indicates that the persons or entities who may be sued as defendants under the statute are limited.  For example, Plaintiffs allege that the Bonsall Defendants assisted the Aloise Defendants in violating Title V.  For Title V, Congress was explicit as to whom may be sued.  The enforcement provision for Title V provides:

> When *any officer, agent, shop steward, or representative of any labor organization* is alleged to have violated the duties declared in subsection (a) [breach of fiduciary duty] and the labor organization

> or its governing board or officers refuse or fail to sue or recover damages or secure an accounting or other appropriate relief within a reasonable time after being requested to do so by any member of the organization, *such member may sue such officer, agent, shop steward, or representative* in any district court of the United States or in any State court of competent jurisdiction to recover damages or secure an accounting or other appropriate relief for the benefit of the labor organization.

29 U.S.C. § 501(b) (emphasis added). Another provision in the LMRDA explains that

> "[o]fficer, agent, shop steward, or other representative," when used with respect to a labor organization, includes elected officials and key administrative personnel, whether elected or appointed (such as business agents, heads of departments or major units, and organizers who exercise substantial independent authority), but does not include salaried nonsupervisory professional staff, stenographic, and service personnel.

29 U.S.C. § 402(q) (emphasis added).

In the instant case, the Bonsall Defendants clearly are not union officers, shop stewards, or representatives. Although Title V also refers to union agents, Plaintiffs have not cited to any authority indicating that "agents" should apply to any person or entity who is hired by or works for a union, including but not limited to union attorneys. Indeed, the text of § 402(q) indicates that Title V is directed at high-level union agents (*e.g.*, business agents) – *i.e.*, those who play such a significant role for the union that a fiduciary duty is fairly imposed on them vis-à-vis the union. Here, while the Bonsall Defendants may have had a fiduciary duty to the unions at issue because of the attorney-client relationship, that does not mean that there was a fiduciary duty for purposes of the LMRDA. Indeed, it is doubtful that union attorneys can fairly be said to exercise something akin to "substantial independent authority" when they must follow the directions of union officers. *Morrissey v. Curran*, 423 F.2d 393 (2d Cir. 1970), one of the main cases on which Plaintiffs rely, is not to the contrary. Although *Morrissey* did involve a defendant that happened to be an attorney sued for breach of fiduciary duty under LMRDA, Title V, he was a proper defendant because he was sued in his capacity as a trustee for a union fund. *See id*. at 385. And to the extent that Plaintiffs argue that the Bonsall Defendants were acting – at least at times – as campaign advisors for Ms. Alvarado, and not as attorneys, they fare no better. A campaign manager, at bottom, represents an individual union member, and does not hold authority in the context of the union generally.

32

Plaintiffs assert that the Bonsall Defendants assisted the Aloise Defendants in violating Title I, and not just Title V.  The enforcement provision for Title I is different from the enforcement provision for Title V in that the former does not clearly spell out who a proper defendant is.  The Title I enforcement provision states:

> Any person whose rights secured by the provisions of this title have been infringed by any violation of this title may bring a civil action in a district court of the United States for such relief (including injunctions) as may be appropriate.  Any such action against a labor organization shall be brought in the district court of the United States for the district where the alleged violation occurred, or where the principal office of such labor organization is located.

29 U.S.C. § 412.  It is unclear from the above provision whether the reference to "labor organization" limits the actors against whom suit may be brought, or merely instructs on proper venue when the defendant happens to be a labor organization.

Assuming the latter (in Plaintiffs' favor), Plaintiffs have still failed to establish that the Bonsall Defendants fall within the proper scope of defendants under Title I of the LMRDA.  The legislative history for Title I indicates that non-union actors are not contemplated as defendants at all.  The first version of the LMRDA was known as the Kennedy-Erwin Bill and did not contain Title I.  *See* S. 1555, 86th Cong. (1959).  Title I came about via an amendment to the bill proposed by Senator John L. McClellan and, as noted above, was intended "to mollify fears that the bill before the Senate inadequately protected union members from abuse or coercive leadership practices."  *Franza*, 869 F.2d at 44; *see also* 105 Cong. Rec. 6472 (1959) (Senator McClellan describing his proposal as one in the interest "of union members and for their protection" "to insure greater integrity in the administration and management of union affairs").  Thus, Title I became known as a "Bill of Rights" for union members.  *See Franza*, 869 F.2d at 44; *see also Local No. 82, Furniture & Piano Moving v. Crowley*, 467 U.S. 526, 528 (1984).  In other words, Title I was enacted to govern the relationship between union members and union officials; non-union actors were not the concern of the legislation.

Notably, courts have assumed that the purpose underlying Title I was to govern the union member-union official relationship, and have not indicated outside relationships were covered.  *See, e.g.*, *United Steelworkers of Am., AFL-CIO-CLC v. Sadlowski*, 457 U.S. 102, 109 (1982)

(explaining that the McClellan amendment was proposed "because [the original bill] did not provide general protection to union members who spoke out against the *union leadership*") (emphasis added); *Finnegan v. Leu*, 456 U.S. 431, 435-36 (1982) (observing that the amendments resulting in Title I "placed emphasis on the rights of union members to freedom of expression without fear of sanctions *by the union*" to ensure that the unions were "*democratically governed* and responsive to the will of their memberships") (emphasis added) (emphasis added); *United Steel Workers Local 12-369 v. United Steel Workers Int'l*, 728 F.3d 1107, 1115 (9th Cir. 2013) (discussing a "congressional concern with widespread abuses of power by *union leadership*") (emphasis added); *see also Tomko v. Hilbert*, 288 F.2d 625, 628 (3d Cir. 1961) (examining with favor district court interpretations of Title I as governing "the union-member relationship" and intending to protect a union member "from the violation of his rights *as against the [u]nion only*") (emphasis added); *Dilacio v. New York City Dist. Council of the United Broth. of Carpenters & Joiners of Am.*, 593 F. Supp. 2d 571, 576 (S.D.N.Y. 2008) (finding that the LMRDA confers jurisdiction against labor organizations and individual *defendants acting under color of union authority* for violations of Title I rights) (emphasis added).

And it is therefore not surprising that several courts have held that a proper defendant for purposes of Title I of the LMRDA is a union or a union officer or agent only – and not, *e.g.*, a non-union actor such as an attorney hired by a union. *See, e.g., Link v. Rhodes*, No. C 06-0386 MHP, 2006 WL 1348424, at *6, 8 (N.D. Cal. May 17, 2006) (noting that, "[a]lthough the Ninth Circuit has not squarely addressed the issue, courts in other circuits have held that the LMRDA only governs labor organizations and their officers and agents when acting in their representative capacities"; dismissing LMRDA claims against law firm defendants because "an LMRDA claim may only be brought against a 'labor organization' and its officers and agents"); *Farrell v. Adams*, No. 03 Civ. 4083(JCF), 2004 WL 433802, at *5-6 (S.D.N.Y. Mar. 10, 2004) (finding it "highly unlikely" that Congress "intended to extend LMRDA liability to persons functioning as legal counsel"; noting that defendant acted in "the role of an attorney and not that of a union official with authority to act for [the local union]"). Moreover, Plaintiffs have failed to cite any authority to support their position that a non-union actor, such as an attorney, should be deemed a proper

34

defendant for purposes of Title I.

Accordingly, the Court dismisses the LMDRA claims asserted against the Bonsall Defendants with prejudice. The Bonsall Defendants are not proper defendants for purposes of Title V or I.

B.    Secondary Liability

For the reasons stated above, the LMRDA claims asserted against the Bonsall Defendants are dismissed with prejudice. However, the Court notes that, even if the Bonsall Defendants could be proper defendants under Title V or Title I, there are independent grounds for dismissing the LMRDA claims. More specifically, Plaintiffs' claim against the Bonsall Defendants is predicated on secondary liability; however their assumption that secondary liability (aiding and abetting, as well as conspiring) obtains under the LMRDA is not well supported.

While Congress has enacted a general aiding and abetting statute applicable to all federal criminal offenses, *see* 18 U.S.C. § 2, it has not done so for civil offenses. Instead, it has provided (or not provided) for such civil liability on a statute-by-statute basis. As the Supreme Court explained in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994), Congress's "statute-by-statute approach to civil aiding and abetting liability" speaks against a presumption of such liability for violations of civil statutes. *Id.* at 182. "[W]hen Congress enacts a statute under which a person may sue and recover damages from a private defendant for the defendant's violation of some statutory norm, there is no general presumption that the plaintiff may also sue aiders and abettors." *Id.* "The fact that Congress chose to impose some forms of secondary liability, but not others, indicates a deliberate congressional choice with which the courts should not interfere." *Id.* at 184. Thus, when a statute is precise about who can be liable, "courts should not implicitly read secondary liability into the statute." *Freeman v. DirecTV, Inc.*, 457 F.3d 1001, 1006 (9th Cir. 2006) (internal quotation marks omitted). Courts have applied *Central Bank*'s rationale beyond securities violations. *See, e.g.*, *Freeman*, 457 F.3d at 1001 (Electronic Communications Privacy Act); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, No. MDL 2672 CRB (JSC), 2017 WL 4890594, at *12 (N.D. Cal. Oct. 30, 2017) (RICO).

Here, the LMRDA is silent on secondary liability. Based on this silence, and the lack of any other indication of Congressional intent to provide for secondary liability, the Court finds that, under *Central Bank*, secondary liability claims under the LMRDA are not viable. This conclusion is consistent with the Ninth Circuit's decision in *Building Material & Dump Truck Drivers, Local 420 v. Traweek*, 867 F.2d 500 (9th Cir. 1989), decided even before *Central Bank*. There, the Ninth Circuit rejected a district court's finding of conspiracy to violate rights protected under LMRDA, Title I, finding no statute or common law to provide jurisdiction over "civil conspiracy in the labor relations field." *Id.* at 512 (citing *Abrams v. Carrier Corp.*, 434 F.2d 1234, 1253 (2d Cir. 1970)); *see also Abrams*, 434 F.2d at 1253 (stating that conspiracy to violate an individual's rights under the LMRDA does not suffice to vest a court with jurisdiction under the LMRDA). *Traweek* suggests that when "an action for conspiracy is not contemplated within the scope of federal labor laws," *Traweek*, 868 F.2d at 512 – *i.e.*, when conspiracy is not expressly addressed as a cause of action – there is no valid claim.

Plaintiffs contend still that the Court should allow their secondary liability claims, relying primarily on a decision from Judge Alsup of this District and the corresponding appellate decision by the Ninth Circuit to support their position. *See Serv. Employees Int'l Union v. Roselli*, No. C 09-404 WHA, 2009 WL 3013501 (N.D. Cal. Sept. 17, 2009); *Serv. Employees Int'l Union v. Nat'l Union of Healthcare Workers*, 718 F.3d 1036 (9th Cir. 2013). More specifically, Plaintiffs assert that Judge Alsup found the LMRDA to provide a basis for secondary liability in *Roselli*, and that the Ninth Circuit indicated approval of this holding on appeal, when it affirmed the jury verdict awarding damages for aiding and abetting.

But Plaintiffs have mischaracterized *Roselli* and therefore the subsequent decision on appeal. The Court acknowledges that there is some language in *Roselli* that arguably could be read in Plaintiffs' favor, but a review of the *Roselli* complaint confirms that the plaintiff's claim for aiding and abetting was predicated on state law and not the LMRDA. *See Roselli*, No. C 09-404 WHA (N.D. Cal.) (Docket No. 344-1, at 46-49) (pleading causes of action for "Conspiracy to Commit Breach of Fiduciary Duty Under California Common Law" and "Aiding and Abetting, Participating in, and/or Knowingly Benefiting From Breach of Fiduciary Duty In Violation of

36

California Civil Code §§ 2223, 2224 and California Common Law"). The LMRDA was referenced in the *Roselli* complaint not as a basis for imposing secondary liability but rather in mere recognition of a fiduciary duty within the union. *See, e.g.*, *Roselli*, No. C 09-404 WHA (N.D. Cal.) (Docket No. 344-1 at ¶ 136) (describing breaches of "fiduciary duties owed to UHW under the LMRDA and California law" in allegations supporting the common law conspiracy claim). In the appeal of *Roselli*, the Ninth Circuit reviewed, *inter alia*, the scope of a fiduciary duty in the context of an inter-union dispute. Its affirmation of the district court's judgment, which included damages for aiding and abetting an LMRDA violation, resulted from this and additional analyses. The Ninth Circuit never addressed or otherwise discussed the availability of secondary liability under the LMRDA. In sum, *Roselli* and the appeal are not on point. This is underscored by the fact that neither *Roselli* nor the appeal addressed the viability of secondary liability in light of *Central Bank* or *Traweek*.

As for the remaining cases cited by Plaintiffs, they are similarly unpersuasive because, the courts dismissed the LMRDA secondary liability claims on other grounds, without ruling on whether secondary liability was, in fact, available under the statute. *See Sampson v. Dist. Council of N.Y. City*, No. 10 Civ. 8120(LAP), 2012 WL 4471535, at *7 (S.D.N.Y. Sept. 27, 2012) (dismissing the aiding and abetting claim in conjunction with the underlying LMRDA violation); *Fox v. Bakery, Confectionary, Tobacco Workers & Grain Millers Int'l Union, Local No. 24, AFL-CIO*, No. C08-05737 WHA, 2010 WL 682458, at *14 (N.D. Cal. Feb. 24, 2010) (dismissing the conspiracy claim for lack of evidence).

C.    Leave to Amend

For the foregoing reasons, the Court dismisses with prejudice Plaintiffs' LMRDA claims against the Bonsall Defendants. The Bonsall Defendants are not proper defendants with respect to the Title V and Title I claims; moreover, even if they were, secondary liability is not permitted under the LMRDA. Because the LMRDA claims are the only claims remaining against the Bonsall Defendants, the Court would ordinarily direct the Clerk of the Court to enter a final judgment in the *Bonsall* case. At the hearing, however, Plaintiffs asked the Court for permission to amend their case to add a *state law* claim for aiding/abetting and conspiracy against the Bonsall

Defendants (that is, assuming that the Court were to dismiss the LMRDA claims for aiding/abetting and conspiracy). Plaintiffs essentially conceded that the Court would not have original jurisdiction (*i.e.*, diversity jurisdiction) over this state law claim but maintained that the Court could exercise supplemental jurisdiction given that the Court had original jurisdiction over the dismissed LMRDA claims. *See* 28 U.S.C. § 1367(a) (providing that, "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States jurisdiction").

The Court acknowledges that, as a general matter, there is a liberal approach to amendment pursuant to Federal Rule of Civil Procedure 15. *See* Fed. R. Civ. P. 15(a)(2) (providing that a "court should freely give leave when justice so requires"); *United States v. Gila Valley Irrigation Dist.*, 859 F.3d 789, 804 (9th Cir. 2017) (noting that, "under Rule 15, leave to amend should be granted unless amendment would cause prejudice to the opposing party, is sought in bad faith, is futile, or creates undue delay") (internal quotation marks omitted). Nevertheless, the Court sees little reason to permit amendment in the instant case when the Court would ultimately decline supplemental jurisdiction over any state law claim. Under § 1367(c), a district court may decline supplemental jurisdiction over a state law claim if "the district court has dismissed all claims over which it has original jurisdiction." *Id.* § 1367(c)(3). In fact, where "the federal head of jurisdiction has vanished from the case," and no substantial commitment of judicial resources has been made to the nonfederal claims, it is . . . akin to 'making the tail wag the dog' for the District Court to retain jurisdiction." *Murphy v. Kodz*, 351 F.2d 163, 167-68 (9th Cir. 1965); *see also Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 561 (9th Cir. 2010) (citing *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988)) (explaining that, when all federal-law claims are eliminated before trial, the balance of factors considered under the doctrine of pendent jurisdiction leans against exercising jurisdiction over remaining state-law claims); *Rojas v. Brinderson Constructors Inc.*, 567 F. Supp. 2d 1205, 1207 (C.D. Cal. 2008) (declining exercise of supplemental jurisdiction over state law claims after dismissing sole claim invoking

original jurisdiction). Here, the case is early in the proceedings, and thus the commitment of judicial resources at this point has been minimal.

The Court acknowledges that an argument could be made in favor of retention of jurisdiction because the Court will still before it the *Aloise* case. However, the fact that the Court will be expending resources on the *Aloise* case does not dictate that the Court should therefore expend additional resources on the *Bonsall* case, particularly where the sole claim at issue would be a state law claim. If Plaintiffs initiate a state law action against the Bonsall Defendants predicated on state law, the state court may decide how best to manage that case in light of the ongoing *Aloise* proceedings.

Accordingly, based on the specific circumstances before the Court, the Court denies Plaintiffs' request for leave to amend.

## VI. <u>CONCLUSION</u>

For the foregoing reasons, the Court rules as follows on the *Aloise* case: (1) the motion to dismiss the Title I claims is granted; (2) the motion to amend to add Title V claims is granted; and (3) the motion to dismiss the Title V claims is granted with respect to the request for injunctive relief but is otherwise denied. With respect to the *Bonsall* case, the motion to dismiss is granted with prejudice. For the *Bonsall* case only, the Clerk of the Court shall enter a final judgment in accordance with the above and close the file in the case.

This order terminates Docket Nos. 31, 38, and 44 in C-18-0411 (*Aloise*), and Docket No. 16 in C-18-1958 (*Bonsall*).

**IT IS SO ORDERED**.

Dated: November 16, 2018

_____

EDWARD M. CHEN
United States District Judge